UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
─────────────────────────────────────────

SYSCO FOOD SERVICES OF HAMPTON
ROADS, INC.,                                    03 Civ. 7384 (JGK)

                         Plaintiffs,            OPINION & ORDER

         - against –

MAERSK LOGISTICS, INC., MAERSK GLOBAL
LOGISTICS, INC, AIRLINE CARGO SERVICES,
INC., FEDERAL EXPRESS CORPORATION, ATLAS
AIR WORDLWIDE HOLDINGS, INC.,

                         Defendants.

─────────────────────────────────────────

JOHN G. KOELTL, District Judge:

        The plaintiff, Sysco Food Services of Hampton Roads,

Inc. ("Sysco"), brought this action against Maersk Logistics,

Inc. and Maersk Global Logistics, Inc. ("Maersk"), Airline

Cargo Services Inc. ("ACS"), Federal Express Corporation

("FedEx"), and Atlas Air Worldwide Holdings, Inc. ("Atlas")

seeking compensatory damages for the destruction of its cargo

while in international transit.

        The plaintiff asserts a claim under the Warsaw

Convention, a multilateral treaty regulating international

air commerce, alleging that the defendants were negligent in

failing to follow explicit instructions for the proper

loading of the cargo, and are liable for the damage caused to

the cargo while in the defendants' charge.  Each of the

defendants has denied liability and has cross claimed against the other defendants.

Defendant FedEx has moved for summary judgment.  FedEx argues, among other things, that it is not liable to Sysco for compensatory damages because the contract between FedEx and defendant ACS is enforceable under the Warsaw Convention and limits FedEx's liability for any damages caused by ACS, that FedEx is entitled to full exoneration under the contributory negligence provision of the Warsaw Convention, and that FedEx is not liable because FedEx strictly adhered to the loading instructions it was given.  Defendants Maersk and ACS and plaintiff Sysco all oppose FedEx's motion for summary judgment.

**I.**

The standard for granting summary judgment is well established.  Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994).  "[T]he trial court's task at the summary

judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution."  Gallo, 22 F.3d at 1224.  The moving party bears the initial burden of informing the district court of the basis for its motion and identifying the matter that it believes demonstrates the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.  The substantive law governing the case will identify those facts that are material and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Consol. Edison, Inc. v. Northeast Utilities, 332 F. Supp. 2d 639, 642 (S.D.N.Y. 2004).

Summary judgment is appropriate if it appears that the non-moving party cannot prove an element that is essential to the non-moving party's case and on which it will bear the burden of proof at trial.  See Cleveland v. Policy Mgt. Sys. Corp., 526 U.S. 795, 805-06 (1999); Celotex, 477 U.S. at 322; Powell v. Nat. Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004).  In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw

all reasonable inferences against the moving party.  See

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S.

574, 587 (1986) (citing United States v. Diebold, Inc., 369

U.S. 654, 655 (1962)); see also Gallo, 22 F.3d at 1223.

Summary judgment is improper if there is any evidence in the

record from any source from which a reasonable inference

could be drawn in favor of the nonmoving party.  See Chambers

v. T.R.M. Copy Ctrs. Corp., 43 F.3d 29, 37 (2d  Cir. 1994).

If the moving party meets its initial burden of showing a

lack of a material issue of fact, the burden shifts to the

nonmoving party to come forward with "specific facts showing

that there is a genuine issue for trial."  Fed. R. Civ. P.

56(e).  The nonmoving party must produce evidence in the

record and "may not rely simply on conclusory statements or

on contentions that the affidavits supporting the motion are

not credible."  Ying Jing Gan v. City of New York, 996 F.2d

522, 532 (2d Cir. 1993); see also Scotto v. Almenas, 143 F.3d

105, 114-15 (2d Cir. 1998); Singh v. New York City Off-Track

Betting Corp., No. 03 Civ. 5238, 2005 WL 1354038, at *1

(S.D.N.Y. June 8, 2005).

## II.

### A.

The following facts are undisputed unless otherwise

stated.  Sysco is a foodservice marketer and distributor that

4

sought to have a shipment of frozen food shipped from the
United States to Qatar.  Sysco signed a Charter Agreement
with Maersk, a freight forwarder, to perform this operation.
Maersk contracted with ACS, a shipping agent, to coordinate
the particulars of the shipment and contract with an aircraft
charter company.  ACS in turn contracted with FedEx to
transport the shipment via aircraft from the United States to
Qatar.  FedEx subsequently leased the aircraft from Atlas.
All parties agree that the cargo was improperly loaded before
departure from the United States.  The plaintiff contends
that there was a loss of $800,000 worth of perishable cargo.
(Sysco's Local Civil Rule 56.1 Stmt. ("Sysco's Stmt."), ¶ 6;
FedEx's Local Civil Rule 56.1 Stmt. ("FedEx's Stmt."), ¶ 6;
Maersk's Local Civil Rule 56.1 Stmt. ("Maersk's Stmt."), ¶ 6;
ACS's Local Civil Rule 56.1 Stmt. ("ACS's Stmt."), ¶ 6.)

     To maintain the food's freshness, Sysco requested that
dry ice be used in the aircraft to help keep the food cold.
Sysco claims that the defendants failed to follow its
instructions and distribute the dry ice throughout the
pallets on the aircraft.  (Sysco's Stmt., ¶ 21.)  It is
undisputed that the dry ice was not distributed throughout
the pallets, and was merely loaded at the doors of the
aircraft.  The parties dispute which of the parties, if any,
instructed FedEx to load the dry ice at the cargo doors

rather than throughout the aircraft's cargo hold.  (See FedEx's Stmt., ¶ 25; Sysco's Stmt., ¶ 25; Maersk's Stmt., ¶ 25; ACS's Stmt., ¶ 25.)

On November 4, 2002, Maersk alerted ACS by email that, pursuant to Sysco's instructions, dry ice would be used for the November 13, 2002 shipment to Qatar.  (FedEx's Stmt., ¶ 10; ACS's Stmt., ¶ 10.)  On November 5, 2002, ACS alerted FedEx by email that, pursuant to Maersk's instructions, the dry ice should be distributed throughout the pallets in the aircraft.  (FedEx's Stmt., ¶ 11; ACS's Stmt., ¶ 11.)  On the evening of November 12, 2002, a conversation took place between ACS employee Louise Olive ("Olive") and Maersk employee Charles MacLeod-Stuart ("MacLeod-Stuart").  FedEx alleges that during that conversation, MacLeod-Stuart informed Olive that dry ice should not be distributed throughout the pallets.  (FedEx's Stmt., ¶ 12; ACS's Stmt., ¶ 12.)  Olive testified that "there was a change in the instructions from Mr. Stuart" and the dry ice was to be loaded at the door so it could be used in Qatar.  (Olive Deposition ("Olive Dep."), pp. 63-64; FedEx's Stmt., ¶¶ 12-14; ACS's Stmt., ¶¶ 12-14.)  MacLeod-Stuart denies that he gave this instruction to ACS or anyone else.  (MacLeod-Stuart Deposition ("MacLeod-Stuart Dep."), p. 163; FedEx's Stmt., ¶ 16; Maersk Stmt., ¶¶ 12-14.)

The parties also dispute whether the "amended, improper instruction" was ever given to FedEx.  FedEx alleges that Olive relayed the amended instruction to fellow ACS employee Geoffrey Comley-Excell ("Comley-Excell") who was scheduled to be on-site at the FedEx facility at JFK that evening. (FedEx's Stmt., ¶ 15.)  While Comley-Excell testified that he received the amended instruction from Olive, he denies ever giving FedEx the instruction.  (ACS's Stmt., ¶ 22.)  While FedEx has produced no evidence that Comley-Excell relayed the amended instruction to FedEx, FedEx asserts that its on-site "load master," Vince Buscarino, received the amended instruction from the "shipper."  (See Transcript of Argument, dated June 29, 2006, p. 4.)  FedEx has not produced any testimony from Buscarino to support this assertion or any evidence to suggest the identity of the "shipper" who allegedly gave Buscarino the alleged, amended instruction.

Contrary to FedEx's assertion and Olive's testimony, MacLeod-Stuart testified that when he arrived at JFK to oversee the loading, he informed Comley-Excell that the dry ice should be distributed throughout the pallets.  (MacLeod-Stuart Dep., pp. 73-74; FedEx's Stmt., ¶ 17.)  MacLeod-Stuart also testified that Comley-Excell rejected this instruction and indicated that "there should not be a need to distribute the ice" and it should be put in the doorways for arrival in

Qatar.  (MacLeod-Stuart Dep., p. 74; FedEx's Stmt., ¶ 18.)
On the other hand, Comley-Excell testified that he attended
the loading as an observer only and that he gave no
instructions to FedEx regarding the placement of the ice.
(Comley-Excell Dep., p. 64; Maersk's Stmt., ¶ 18.)  MacLeod-
Stuart also testified that he did not protest Comley-Excell's
instruction because he relied upon ACS's knowledge of loading
and chartering.  (FedEx's Stmt., ¶ 19.)

The timeline in which the frozen food, the dry ice, and
the representatives from the parties arrived at JFK is
generally undisputed.  Maersk asserts that the dry ice
arrived between 4:00 p.m. and 5:00 p.m. on November 12, 2002
and the frozen food began arriving "well prior" to 8:00 p.m.
on November 12, 2002.  (Maersk's Stmt., ¶ 2.)  Similarly, ACS
asserts that the frozen food began arriving at JFK at
approximately 2:00 pm on November 12, 2002.  (ACS's Brief in
Opposition to FedEx's Motion for Summary Judgment, p. 5;
ACS's Stmt., ¶¶ 31-33.)  ACS has also offered testimony from
Edward Rogers ("Rogers"), who was employed by the
refrigerator truck company responsible for transporting the
food to JFK.  Rogers' testimony confirms that truckloads of
the frozen food began leaving the warehouse in Perth Amboy,
New Jersey at about noon and the last truckload left for JFK
at about 4:00 pm on November 12, 2002.  (See ACS's Stmt., Ex.

6.)  FedEx and Sysco do not dispute the evidence offered by either Maersk or ACS concerning the timeline of events.

There is also agreement on the arrival times of MacLeod-Stuart and Comley-Excell at JFK.  ACS and Maersk agree that Comley-Excell arrived at JFK between 8:00 p.m. and 8:30 p.m. on November 12, 2002.  (ACS's Stmt., ¶ 25; Maersk's Stmt., ¶ 2.)  MacLeod-Stuart testified that he arrived at JFK at 8:00 p.m. on November 12, 2002 and his testimony is undisputed. (MacLeod-Stuart Dep., p. 68.)  Comley-Excell testified that when he arrived at JFK, the cargo was already being placed on the aircraft pallets and that the aircraft "belly had already been loaded."  (ACS's Stmt., ¶¶ 26-30; Maersk's Stmt., ¶¶ 7, 20.)  It is undisputed that only FedEx personnel unloaded the refrigerated trucks, moved the cargo into the FedEx facility at JFK, built the aircraft pallets, and loaded the cargo into the aircraft.  (FedEx's Stmt., ¶ 21; Sysco's Stmt., ¶¶ 4, 21, 23-24, Maersk's Stmt., ¶¶ 2, 7.)

FedEx simply argues that there is only a dispute of fact over who between Maersk and ACS relayed the alleged amended, improper instruction to its personnel.  (FedEx's Stmt., ¶ 22.)  FedEx maintains that "there exists no issue of fact that the plane was loaded [by its personnel] in accordance with instructions received from ACS."  (FedEx's Stmt., ¶¶ 22, 25.)  In opposition, Sysco, Maersk, and ACS, argue that FedEx

has produced no evidence that FedEx personnel received the amended instruction from any of their personnel. (Sysco's Stmt., ¶¶ 22, 25; Maersk's Stmt., ¶ 22; ACS's Stmt., ¶ 22.) In addition, ACS and Maersk rely on their explanation of the timing of the loading to establish that FedEx initiated the improper loading before their personnel arrived at JFK. ACS asserts that the pallets were "built up by FedEx before FedEx received any instruction from ACS." (ACS' Stmt., ¶ 35.)

For the purpose of this motion, Sysco categorically denies virtually all of the aforementioned factual assertions by the other parties. Sysco does so broadly, without specific explanation and without offering contrary testimony or evidence. (See Sysco's Stmt., ¶¶ 9-20.) Sysco does, however, make three factual assertions. First, Sysco agrees with ACS and Maersk that there is no evidence that FedEx personnel received the amended, improper instruction. (Sysco's Stmt., ¶ 25.) Second, Sysco acknowledges that there is evidence that the improper instruction was relayed from MacLeod-Stuart, to Olive, and subsequently to Comley-Excell. (Sysco's Stmt., ¶ 25.) Sysco presumably chose not to comment on the accuracy or credibility of this evidence because it was not privy to any of these alleged conversations. Third, Sysco agrees that the evidence establishes that both MacLeod-Stuart and Comley-Excell were on-site at JFK to witness some

10

of the loading.  (Sysco's Stmt., ¶ 25.)  Thus, Sysco argues
that both MacLeod-Stuart and Comley-Excell "witnessed and
approved the negligent build-up and loading of the airline
pallets by FedEx and negligently failed to object."  (Sysco's
Stmt., ¶ 25.)

Maersk disputes this fact.  Maersk asserts that when
MacLeod-Stuart arrived at JFK, the extent to which the
airline pallets had been built-up and loaded into the
aircraft by FedEx personnel is unclear.  (Maersk's Stmt., ¶¶
7, 20.)  MacLeod-Stuart testified that he was not on site for
portions of the loading process and took breaks to attend to
other matters, "during which he could not have observed the
build-up of the airline pallets or loading into the
aircraft."  (Maersk's Stmt., ¶ 20.)

**B.**

The parties also dispute how various contracts affect
their legal relationships and responsibilities.  The parties
have identified three contracts that are purported to govern
this case.  The first contract is Maersk's Aircraft Charter
Agreement ("Maersk Agreement"), which was entered into by
Sysco and Maersk on October 25, 2002, when Maersk's services
were retained.  (See Sysco's Stmt., Ex. 1.)  The Maersk
Agreement specifies that the price includes "loading" and
"building" the pallets for the aircraft.  (See Sysco's Stmt.,

11

Ex. 1.)  The second contract is FedEx's Aircraft Charter Agreement ("FedEx Agreement"), dated October 25, 2002, which was entered into by ACS and FedEx to transport the cargo. (See FedEx's Stmt., Ex. F.)  FedEx claims that its responsibilities and liability for the carriage is embodied in the standard "Terms and Condition of Contract" on the reverse side of the FedEx Agreement.  (FedEx's Stmt., ¶ 24; Sysco's Stmt., ¶¶ 23-24.)  Specifically, FedEx alleges that the FedEx Agreement exculpates it from any liability for improper loading of the aircraft.  Sysco, ACS, and Maersk all deny that FedEx's liability for the destroyed cargo is accurately set forth in the FedEx Agreement because its language conflicts with the provisions of the Warsaw Convention.  (Sysco's Stmt., ¶¶ 23-24; ACS's Stmt., ¶ 24; Maersk's Memorandum in Opposition to FedEx's Motion for Summary Judgment, pp. 4-5.)  Maersk asserts that it was not privy to the FedEx Agreement.  (Maersk's Stmt., ¶ 23.)  The third contract is the FedEx International Air Waybill ("FedEx Waybill"), dated November 12, 2002, between FedEx and Sysco as the consignor/shipper.  (See FedEx's Stmt., Ex. E; Sysco's Stmt., Ex. 3.)  The FedEx waybill lists ACS care of Maersk as the carrier's agents.  (See Id.)  Maersk also asserts that it was not privy to the FedEx Waybill.  (Maersk's Stmt., ¶ 23.)

**III.**

There is a threshold issue concerning the law to be applied.  There are three treaties that possibly apply to this case:  the Warsaw Convention,[1] The Hague Protocol,[2] and Montreal Protocol No. 4.[3]  The Warsaw Convention was adopted in 1929 and was ratified by the United States in 1934.  The Hague Protocol, which amended the Warsaw Convention, was adopted at an international conference at The Hague in 1955.  The Hague Protocol, however, was not ratified by the United States until 2003.  See Avero Belgium v. American Airlines, 423 F.3d 73, 83 (2d Cir. 2005).  Therefore, because all of the documents were executed in October and November 2002, and the shipment occurred in November 2002, the amendments to the Warsaw Convention made in The Hague Protocol do not govern this case.  Id.  Montreal Protocol No. 4, which amended the Warsaw Convention as amended by The Hague Protocol, was adopted in 1975.  The United States ratified Montreal Protocol No. 4 in 1998.  Id.  In Avero Belgium v. American

[1] Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000 (1934), 137 L.N.T.S. 11, reprinted in note following 49 U.S.C. § 40105 ("Warsaw Convention").

[2] The Convention for the Unification of Certain Rules Relating to International Carriage by Air Signed at Warsaw on 12 October 1929 as Amended by the Protocol done at The Hague on 28 September 1955, 478 U.N.T.S 371 ("The Hague Protocol").

[3] Montreal Protocol No. 4 To Amend the Convention for the Unification of Certain Rules Relating to International Carriage by Air Signed at Warsaw on 12 October 1929 as Amended by the Protocol done at The Hague on 28 September 1955, 2145 U.N.T.S. 36 ("Montreal Protocol No. 4").

Airlines, the Second Circuit Court of Appeals held that the United States did not accede to the provisions of the Hague Protocol by virtue of its ratification of Montreal Protocol No. 4 in 1998.  423 F.3d at 83.  Therefore, at the time of the relevant events in this case, the applicable law in force was the Warsaw Convention as amended only by Montreal Protocol No. 4 and not The Hague Protocol.[4]  See Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A., 347 F.3d 448, 460 n.2 (2d Cir. 2003).

The Warsaw Convention applies to "all international transportation of persons, baggage, or goods performed by aircraft for hire."  Warsaw Convention, Art. 1.  The Warsaw Convention defines "international transportation" as "any transportation which, according to the contract made by the parties, the place of departure and the place of destination... are situated... within the territories of two High Contracting Parties...."[5]  Warsaw Convention, Art. 1(2).  When applicable, the provisions in the Warsaw Convention preempt any federal or state common law that might typically apply.  As Sysco correctly asserts, federal common law is applicable only to fill in the "gaps" left by the drafters to

---

[4] Consequently, when the Court refers to the "Warsaw Convention" in this Opinion, the Court is referring to the original Warsaw Convention as amended by Montreal Protocol No. 4.

[5] Both the United States and Qatar are signatories.

allow for national differences.  For example, federal common law governs the details of a contributory negligence defense under Article 21 of the Warsaw Convention.  See Eichler v. Lufthansa German Airlines, 794 F.Supp. 127, 129-30 (S.D.N.Y. 1992) (citing In re Air Disaster at Lockerbie, Scotland 928 F.2d 1267, 1279 (2d Cir. 1991)).

**IV.**

Defendant FedEx moves for summary judgment on the ground that the FedEx Agreement it signed with ACS relieves FedEx from any liability related to negligent loading of the aircraft.  FedEx argues that Article 33 of the Warsaw Convention allows parties to a shipment to enter into a contract so long as the terms of that contract do not conflict with the terms of the Warsaw Convention.[6]  While true, FedEx's argument fails because the provision on which FedEx relies does in fact conflict with the Warsaw Convention.The FedEx Agreement contains the following pertinent provisions:

> 1. In tendering cargo for carriage, Charterer
> [ACS] agrees to these TERMS AND CONDICTIONS OF
> CONTRACT... and that this Federal Express Air
> Waybill is NONNEGOTIATBLE and has been
> prepared by Charterer or on Charterer's behalf
> by Federal Express.   This agreement... is

---

[6] See Warsaw Convention, Art. 33 ("Except as provided in paragraph 3 of Article 5, nothing contained in this Convention shall prevent the carrier either from refusing to enter into any contract of carriage or from making regulations which do not conflict with the provisions of this convention.").

entered into by Charterer both on its behalf and as agent for all parties having an interest in the carry.

2. Charterer agrees that carriage is subject to terms and conditions stated herein and applicable tariffs...

3. a) Shipments must be so prepared, packed, and loaded by Charterer as to ensure safe transportation by ordinary handling.

   b) Any article susceptible to damage by ordinary handling must be adequately protected by Charterer by proper packing...

   c) Any article susceptible to damage as a result of any conditions which may be encountered in air transportation, such as high or low temperatures... must be adequately protected by Charterer by proper packing and any other necessary measures to ensure safe transportation.

   ....

   g) Federal Express retains the right to reject a shipment prior to the performance of any transportation by air from the airport of origin when, in the opinion of Federal Express, such shipment is improperly packed or packaged, or is subject to damage if exposed to heat or cold.... However, such right on the part of Federal Express shall not in any way operate to relieve Charterer of or impose on Federal Express Charterers responsibility for proper preparation, protection packing and marking of shipments hereunder or to relieve Charterer of or impose on Federal Express any liability resulting from any breach of such responsibility or from the nature of or any defect in the shipment (emphasis added).

   FedEx claims that it is relieved of any liability for a breach of any of the responsibilities required to protect the

16

cargo by proper packing and that it is therefore
contractually relieved of liability in this case because
damage arose from the alleged failure to place the dry ice
properly throughout the load.  FedEx argues that carriers
should not be liable for the proper packaging of cargo.

Initially, it should be noted that FedEx has failed to
distinguish between the "packaging" of the cargo and the
"loading" of the cargo.  The alleged negligence in this case
concerns the failure to distribute the dry ice among the
pallets of frozen food during the loading of the aircraft.
The parties have not disputed whether the actual packaging of
the frozen food was adequate.

In any event, FedEx's effort to be exonerated from
liability for the placement of the dry ice in the aircraft
based on a contractual provision that avoids liability for
inadequate packaging conflicts with the Warsaw convention.
Under Article 18, as amended by Montreal Protocol No. 4, a
carrier is "liable for damage sustained in the event of
destruction or loss of, or damage to, cargo upon condition
only that the occurrence which caused the damage so sustained
took place during the carriage by air."  Warsaw Convention,
Art. 18(2).  Article 18(4) defines "carriage by air" as "the
period during which the baggage or cargo is in the charge of
the carrier, whether in an airport or on board an

aircraft...."  Warsaw Convention, Art. 18(4).  Thus, "carriage by air" is not limited to actual air travel, rather, the "plain language of Article 18 draws the line at the airport's borders."  Victoria Sales Corp. v. Emery Air Freight, Inc., 917 F.2d 705, 707 (2d Cir. 1990).[7]

In this case, it is undisputed that the improper loading occurred at the airport while the cargo was being loaded by FedEx personnel.  Therefore, the loading is part of "carriage by air" and FedEx as the carrier is liable under Article 18 for any damages that occur during that process.  Because FedEx is liable for this damage, any clause in the FedEx Agreement that exonerates FedEx from liability during the "carriage by air" conflicts with Article 18.  FedEx attempts to read Clause 3(g) of the FedEx Agreement, relating to proper packaging, to exonerate it from liability for alleged improper loading of the airplane.  If Clause 3(g) of the FedEx Agreement were read to exonerate FedEx from liability for improper loading of the airplane, it would conflict directly with Article 18, which

---

[7] Victoria Sales was interpreting similar language in Article 18(3) of the Warsaw Convention prior to its amendment by Montreal Protocol No. 4:

> The period of transportation by air shall not extend to any transportation by land, by sea, or by river performed outside an airport.  If, however, such transportation takes place in the performance of a contract for transportation by air, for the purpose of loading, delivery or transshipment, any damage is presumed, subject to proof to the contrary, to have been the result of an event which took place during the transportation by air.

makes the carrier liable for loading cargo at the airport.
Therefore, Clause 3(g) of the FedEx Agreement does not
exonerate FedEx from liability for the loading of the cargo at
issue in this case.

This conclusion is strengthened by Montreal Protocol No.
4.  Montreal Protocol No. 4 added a new Paragraph 3 to Article
18.  That paragraph provides that "the carrier is not liable
if he proves that the destruction, loss of, or damage to, the
cargo resulted solely from one or more of the following... b)
defective packing of that cargo performed by a person other
than the carrier or his servants or agents...."  This
provision makes it clear that even if the placement of the dry
ice could be considered "packing," FedEx would not be relieved
of liability because the placement of the dry ice was
performed by FedEx personnel.

Sysco, Maersk and ACS also argue that Article 23 of the
Warsaw Convention forecloses FedEx's effort to avoid
liability.  Under Article 23, "any provision tending to
relieve the carrier of liability or fix a lower limit than
that which is laid down in this convention shall be null and
void."  Warsaw Convention, Art. 23.  The "lower limit"
referred to in Article 23 is the limit in Articles 20 and 22,
which limits the carrier's liability and the amount of damages

recoverable under the Warsaw Convention.[8]  Butler's Shoe Corp.
v. Pan American World Airlines, Inc., 514 F.2d 1283, 1285
(5th Cir. 1975).  Under Article 22, a carrier's liability for
damage to cargo is limited to a specific monetary amount per
kilogram.  See Mitsui Marine & Fire Ins. Co. v. China
Airlines, Ltd., 101 F.Supp.2d 216, 219-20 (S.D.N.Y. 2000).
Any contract clause that attempts to limit the amount of
recoverable damages to less than the amount provided in
Article 22 "tends to relieve the carrier of liability" under
Article 23.  See Butler's Shoe Corp., 514 F.2d at 1285; see
also Motorola, Inc. v. Federal Express Corp., 308 F.3d 995,
1002-03 (9th Cir. 2002).  If Clause 3(g) of the FedEx
Agreement limits the amount of recoverable damage to zero, as
FedEx interprets it, it would set a lower limit on liability
than that provided by Article 22 and be null and void under
Article 23.

V.

FedEx also moves for summary judgment on the ground that
Article 21 of the Warsaw Convention allows it to be fully
exonerated from liability.  Article 21(2) of the Warsaw
Convention, as amended by Montreal Protocol No. 4, provides:

> In the carriage of cargo, if the carrier proves
> that the damage was caused by or contributed to by

---

[8] Article 20 of the Warsaw Convention as amended by Montreal Protocol No.
4 relates to the carriage of passengers and baggage and damage occasioned
by delay in the carriage of cargo and is not relevant to this case.

> the negligence or other wrongful act or omission
> of the person claiming compensation, or the person
> from whom he derives his rights, the carrier shall
> be wholly or partly exonerated from his liability
> to the claimant to the extent that such negligence
> or wrongful act or omission caused or contributed
> to the damage.

FedEx contends that "[r]egardless of who the court ultimately determines made the decision to avoid distribution of the ice, the fact is, FedEx followed the loading instructions completely." (FedEx's Combined Motion and Memorandum for Summary Judgment, p. 8.) FedEx argues that it was because of the negligence of one of the other parties that the damage occurred. Thus, FedEx argues that under Article 21, the Court should grant its motion for summary judgment and fully exonerate FedEx from liability. FedEx's argument is without merit.[9]

FedEx is not entitled to summary judgment based on Article 21 because FedEx has not shown, based on the undisputed facts, that the damage was caused by Sysco, the person claiming compensation. FedEx argues that Maersk and ACS were acting as agents for Sysco and that their alleged negligence is attributed to Sysco, which is the party claiming compensation. Sysco denies that Maersk and ACS were acting as its agents and argues that, pursuant to the air waybill, they

---

[9] While Maersk had argued that Article 21 of the Warsaw Convention applied only to personal injury claims, Article 21(2), as amended by Montreal Protocol No. 4, makes clear that it applies to cargo damage claims as well.

were FedEx's agents.  There are issues of fact as to whether Maersk and ACS were agents for Sysco.

There are also issues of fact as to whether the damages were caused by FedEx's own negligence.  No party has admitted to giving FedEx instructions to load the dry ice at the door of the plane and the other defendants argue that the evidence supports a conclusion that FedEx loaded the airplane without distributing the dry ice properly before representatives of Maersk and ACS arrived at the airport.  The degree of negligence, if any, by FedEx cannot be determined on this motion for summary judgment.  At trial, FedEx may provide evidence of negligence on the part of its co-defendants or Sysco.  Because of the disputed nature of the facts of this case, the merits of FedEx's Article 21 defense can only be decided by the fact-finder at trial.

**VI.**

FedEx also argues that summary judgment is appropriate in this case because there are no genuine issues of material fact and that, based on the undisputed facts, one of the other defendants was negligent because FedEx simply followed the instructions it was given.  FedEx argues that the "origin" of the improper, amended instruction is unclear, but that this is not a disputed material fact that would prevent the granting of this motion to FedEx.  FedEx argues that it is clear that

it was simply following instructions and that the source of
the instructions should be decided between ACS and Maersk, but
does not prevent summary judgment in favor of FedEx.

FedEx views the disputed facts too narrowly.  At this
point, it is disputed whether MacLeod-Stuart ever gave the
improper, amended instruction to Olive.  There are also gaps
in the testimony as to whether Comley-Excell (or any other
employee of ACS or Maersk) relayed that improper, amended
instruction to FedEx personnel.  FedEx has not produced any
admissible testimony on this issue.  In fact, the evidence
suggests that the last email from ACS to FedEx, one week
before the shipment, instructed that the ice should be
distributed throughout the pallets.  In addition, the
substance of the communications between Comley-Excell,
MacLeod-Stuart, and FedEx personnel at JFK on November 12,
2002 is also disputed.  The substance of these communications
is necessary to determine which party, if any, gave any
amended, improper instruction to FedEx or failed to make a
timely objection to a loading procedure that was known to be
improper.

For the purpose of this motion, where all reasonable
inferences must be construed against the moving party, FedEx
has not shown that it received improper instructions or acted

with the due care required for exoneration.  Therefore,

FedEx's motion for summary judgment must be denied.

## CONCLUSION

For the reasons explained above, FedEx's motion for

summary judgment is **denied.**

**SO ORDERED.**

**Dated:**     **New York, New York**
            **August 29, 2006**

                                    John G. Koeltl
                        United States District Judge

24